NAVASSA GUANO CO. *v.* COMMERCIAL GUANO CO.

Where, by the terms of a plain and unambiguous written contract, one party purchased from another a certain and designated pile of fertilizer in bulk, the same being then stored in a named warehouse, and "estimated to be 253⅓ tons, more or less," the contract stipulating that the purchaser should pay for the same at a specified price per ton, and that if there should be more than 253⅓ tons the purchaser should pay for the excess at that price, and if less than 253⅓ tons the seller should refund the shortage at the same rate, the purchaser was bound to pay the contract price for the entire lot, although by actual weight it proved to be $702\frac{7}{10}$ tons, it not appearing that the seller practiced any actual fraud in the representations made by him as to the quantity, and the evidence showing, as found by the judge, who tried the case without a jury, that the purchaser did not in fact act upon any representations made by the seller, but relied upon his own judgment as to the quantity of fertilizer in the pile.

January 8, 1894.

Complaint for damages.    Before Judge MacDONELL. City court of Savannah.    May term, 1893

"On November 9th, 1891, Coleman and Ray, of Macon, Ga., entered into the following written contract with the Commercial Guano Company:

'Georgia, Bibb county. Know all men by these presents, that we, Coleman and Ray, a firm composed of Robert Coleman and Bolivar Ray, of said State and county, for and in consideration of the sum of fifty-seven hundred dollars cash in hand paid to us by the Commercial Guano Co., existing as a corporate body under the laws of said State, of the county of Chatham, the receipt of which is hereby acknowledged, have granted, bargained and sold, and by these presents do grant, bargain and sell unto the said Commercial Guano Co., its successors and assigns, all their ammoniated fertilizer in bulk, and now stored in the guano house in the northwest corner of the warehouse of the said Coleman & Ray in the city of Macon and the county of Bibb, said ammoniated fertilizer estimated to be 253⅓ tons, more or less. Should there be more than 253⅓ tons, the said Commercial Guano Co to pay for all over

said 253⅓ at the rate of $22.50 per ton; but should there be less than 253⅓ tons, then the said Coleman and Ray are to pay back to said Commercial Guano Co. for such shortage at the rate of $22.50 per ton, that being the price per ton at which said fertilizer was sold. The title to which said bargained property to the said Commercial Guano Co., its successors and assigns, we hereby warrant and defend against the claims of all other persons whatsoever; and we do further covenant with and warrant to the said Commercial Guano Co., its successors and assigns, that said bargained property is the same as made up by Coleman and Ray and called by them "Coleman & Ray's High Grade," and guaranteed by them to run according to the standard required by the laws of this State. Witness our hands and seals this 9th day of November, 1891.    Coleman & Ray  (L.S.) 'Signed, sealed and delivered    Robert Coleman  (L.S.) in presence of J. G Wilburn.    Bolivar H. Ray  (L.S.) Isaac Hardeman, Not. Pub., Bibb Co., Ga.'

"The Commercial Guano Company accepted this bill of sale and had it recorded in the clerk's office of the superior court of Bibb county. They also sacked up and carried away and paid for 265⅕ tons of said fertilizer, but subsequently declined to accept and pay for any more of it. Coleman and Ray being financially embarrassed, on November 23d, 1891, transferred in writing for a valuable consideration to another creditor, the Navassa Guano Company, all their rights under the contract, and gave it an order on the Commercial Guano Company for any and all surplus funds due for excess of guano over 253⅓ tons as per the contract of November 9th, 1891. On November 28th the Commercial Guano Company notified Coleman and Ray for the first time that it would not accept the remainder of the fertilizer, the 'more or less' meaning that there might be a few tons over or under the estimated quantity of 253⅓ tons. On December 18th, 1891, the Navassa Guano Company notified the Commercial Guano Company that it would, after advertising, sell at public sale,

on December 30th, 1891, the balance of the fertilizer to the highest bidder, and hold it, the defendant, for the difference between the contract price and the market price. The sale took place as advertised; the fertilizer was sold at $17.00 per ton, the agent of the Commercial Guano Co. being present and bidding $16.95 per ton. The balance of the fertilizer thus sold was, upon sacking and weighing, found to contain 437½ tons, the contract price having been $22.50, and the market price $17.00, thus making a difference of $5.50 per ton, or a total of $2,406.25. The Navassa Guano Co. brought its suit against the Commercial Guano Co. for this sum with interest thereon from January 1st, 1892, and also for $19.80, the cost paid to the Macon Telegraph, a newspaper, for advertising the resale. The defendants filed their plea alleging that they were not bound by the contract, because they were induced to give their assent to it by the fraudulent misrepresentations of Coleman and Ray that the pile contained only about 250 tons, with possibly a few tons over or under and not more.

"The court was requested to construe the contract. We have experienced some difficulty in arriving at conclusions with which we are entirely satisfied. The goods are sold in bulk, and the pile is completely identified by reference to independent circumstances. The quantity sold is 'estimated to be 253⅓ tons more or less.' Should there be more than 253⅓ tons, the defendant agrees to pay for all over said 253⅓ tons at the rate of $22.50 per ton; but should there be less than 253⅓ tons, then the said Coleman and Ray are to pay back to defendant for such shortage at the rate of $22.50 per ton. The consideration is thus put on a sliding scale to adjust itself and keep pace with the possible variations from the estimated quantity, preserving, in any event, equality in this respect between the parties. The contract is clear and unambiguous. The trouble is between the entire

pile and the estimated quantity; they are widely at variance. To which term of the contract shall be given the' greater importance? Can they be harmonized? if not, which should prevail? The words 'estimated to be $253\frac{1}{3}$ tons more or less' in the bill of sale mean that this was the mutual estimate of both parties. It amounted to an express declaration on the part of Coleman and Ray that this was their estimate, they executing the instrument; and the defendant by accepting the bill of sale stipulated that it was its estimate. It was thus the intention of both parties expressed on the face of the contract. It is true that apt words express the intent of both parties likewise to convey the entire pile. But this is a case where we think the general intent is restrained by the particular intent. The only intent as to the measure of the quantity intended to be conveyed is contained in the estimate, and on that particular question it should be controlling. According to the great weight of the authorities, the words 'more or less' are put in to allow for accidental variations that are not unreasonable. The code, §2642, lays down a rule of construction as to what deficiency the words 'more or less' in a sale of lands will cover. It does not depend solely on the code. Substantially the same law is recognized in the English and American cases. It applies to sales of personalty as well as realty, to questions of excess as well as deficiency. Briefly stated, it is that a wide variance from the mutual estimate of the parties should not be allowed, but a reasonable latitude should be permitted in the performance. The exact estimate is not warranted, but only a reasonable conformity to it. In this case the mutual estimate was $253\frac{1}{3}$ tons, more or less. The actual amount in the pile was afterwards found to be $702\frac{7}{10}$ tons. The excess over the estimate amounted to $449\frac{1}{3}$ tons. One of the witnesses characterized this as 'a horrible excess.' We think it is so great

that some willful deception or gross mistake is suggested to the mind by a mere comparison of that amount with the estimate. We cannot think that the parties, by the use of the words 'more or less,' contemplated or intended such a wide variation from the mutual estimate as this. The decision in the case of Brawley *v.* The United States, 6th Otto, p. 168, to the effect that in such cases, the goods being identified by independent circumstances, the contract applies to the specific lot and the naming of the quantity is not regarded in the nature of a warranty but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it, is high authority and seems against the views we entertain. But is there no limit to its application? Shall it hold in cases where the excess shocks the reason? To do so would be to violate the rule which looks to the whole contract in arriving at the construction of any part, and which prefers to uphold a contract in whole and in every part. Why deliberately insert an estimate of the quantity in the contract, if no effect is to be given to it? A sale of the pile identified by independent circumstances, silent as to quantity, would effectuate this intention as well. The more just and liberal rule of construction is that followed by the code of Georgia [where] the deficiency is gross. The words 'more or less' will not cover such deficiency, or by like reasoning such an excess. Even the rule in Brawley *v.* The United States requires good faith in reference to the estimate of the probable amount, from the party making it. Why should not equal good faith be required of them in conforming to the estimate, especially where, as in the present case, it was in the power of Coleman and Ray to do so? We think it bad faith in them to depart from it and to endeavor to force upon defendant the gross excess over the estimate expressed in the instrument.

"If these views are correct, we think that the defendant has reasonably complied with its contract in accepting and paying for 265⅕ tons of the fertilizer, and cannot be required to accept or pay for the balance of the excess, and that the plaintiff is not entitled to recover. We realize, however, that the Supreme Court, in its wisdom, may adhere more stringently to the rule of construction laid down in the case of Brawley *v.* The United States, and subordinate the estimated quantity to the other important intention expressed, that of conveying 'all their ammoniated fertilizer in bulk,' etc., as identified by reference to the independent circumstances, in which event the defendant would be held bound to take and pay for the contents of the entire pile. If that construction should be followed, it would necessitate an examination into the defence set up in the pleadings; and in order to facilitate, as far as we can, the final adjudication of the rights of the parties, we will next consider such defence. The issue made by the pleadings, that the contract was induced by the fraudulent misrepresentations of Coleman and Ray, raises questions that are to be determined by the evidence. Is it true that such misrepresentations were made, and that they were the considerations which caused the defendant to enter into the written contract? The first intention of the defendant undoubtedly was, not to buy fertilizers, but to take from Coleman and Ray, their debtors, so much only of the fertilizers as would pay their debt of $5,700 at $22.50 per ton, the agreed value, to do which 253⅓ tons would have been sufficient,—Coleman and Ray being in failing circumstances, and these being the only assets in their hands available for such settlement. This proposition was made by Coleman and Ray and accepted by defendant. Under this agreement, it would have been immaterial to defendant how much more the pile contained after tak-

ing out their 253⅓ tons. But it must have been apparent that the pile contained more. The debtors being in failing circumstances, other creditors might levy upon the pile to satisfy their debts, and the defendants be put to expense, delay and annoyance in having to file claims and sustain litigation. After consultation with their legal counsel, in which these contingencies were discussed and considered, defendant, to obviate such difficulties, came to the distinct second intention of acquiring title to the entire pile, and so notified Coleman and Ray that it would buy all or none. The contract was then written or dictated by defendant's own attorney, Col. Isaac Hardeman, who remembers that Huger said there was not much more than the 253⅓ tons in it, there might be a little more or a little less, and whose understanding was that Huger was buying the entire pile upon the terms and conditions stated in the bill of sale. It is contended by defendant that it never would have entered into such an agreement if Mr. Coleman had not repeatedly asserted that the pile contained only about 250 tons with possibly a few tons over or a few tons under. In the language of Mr. Battey: 'If we had known for one instant that there was such a horrible excess, we would not have made it.' It is admitted in plaintiff's amended declaration that Coleman 'said in his opinion there was about 250 tons, perhaps more and perhaps less, and he did not know how much was there.' Coleman in his testimony admits that he did tell Battey and Huger repeatedly that there were 250 tons in there, and that he told them to the best of his knowledge that he did think there were 250 tons there and that he was honest in that, that he could not tell, Mr. Wilburn (the book-keeper) kept the books. These are strong admissions. The statements necessarily conveyed the impression that in Coleman's opinion this was about the true amount, and it proceeded from one who

ought to have known the truth. Was it an innocent statement? It seems incredible that this debtor could have been in failing circumstances and had on hand in daily sight such a valuable asset as this, a mixture which he had himself compiled, worth about $15,444, or deducting 250 tons, still worth at $22.50 per ton about $10,162.66, and yet be in utter ignorance of it. Still it is not impossible that such might have been the case. The very fact that they were in failing circumstances might indicate that the business was conducted carelessly. In either event, however, whether the statement was made knowingly and willfully with intent to deceive, or by mistake and innocently, it would still be a fraud (Code, §3174) *if it was acted on by the opposite party,* and would furnish good ground for annulling or apportioning the contract. Nor do we see much in the suggestion that the subsequent statement of Ray, that he thought there was in the neighborhood of 500 tons in the pile, could offset the reiterations of Coleman. They would still have the right to act on Coleman's representations. 'All the partners are responsible to innocent third persons for damages arising from the fraud of one partner in matters relating to the partnership.' Code, §1915. Both would be misleading as to the true quantity, and the firm would be bound for that statement which made most strongly against it, provided it was acted upon by the opposite party.

"And this brings us to another question. Assuming that there were such misrepresentation, was it in fact acted upon? Did it determine the conduct of the defendant in entering into the contract? The code seems to regard this as essential (§2634, §3174) to afford ground of relief. To the same effect is Tiedeman on Sales, §161. ' It is also necessary, to constitute ground for the charge of fraud, that the deceit should be successful in that the party intended to be influenced actu-

ally relied upon the misrepresentation. If the other party did not rely upon the misrepresentation, but was induced by *other considerations* to make the contract, then he was not deceived, and he could not afterward secure a release from the contract on the ground of fraud in the negotiation, for he was not defrauded.' We have already seen that the defendant desired to get title to the entire pile to avoid the annoyance and delay of having to contest with the claims of other creditors who might levy upon the pile, and that after consultation with counsel on the subject they desired and asked for a sale of all or none. Huger was the secretary, treasurer and general manager of the defendant, the Commercial Guano Company. Did he rely on his own judgment as to the quantity in making the contract? The evidence is conflicting. He had been in the business of manufacturing fertilizers eight or nine years. Battey had been connected with the business either as salesman or local agent for fourteen years. They had considerable experience in fertilizers. Both had examined the pile before the bill of sale was drawn up. Battey and Huger on the witness stand assert that they went on what Coleman said. Wilburn and Ray are positive that Huger relied upon his own experience and judgment even after they had expressed to him their opinion that there was much more than 250 tons in the pile, Ray claiming that he said he thought there was double that quantity or in the neigborhood of 500 tons. Battey and Huger deny that they heard any such statement. Col. Hardeman's testimony coincides with that of Ray and Wilburn. We think his testimony is entitled to special weight. He is a disinterested witness, was attorney for defendant in the transaction, dictated the bill of sale and was present during the negotiations immediately preceding its execution. The other conflicting witnesses are, as far as we know, equally

credible and intelligent. It is of course difficult always to read one's mind and tell with accuracy what influences or controls it in a given action. In this case Huger says he asked Coleman repeatedly, he may have asked him 20 times, how much was in the pile, and he kept on saying there were about 250 tons. A pertinent inquiry would be, why, if Coleman's statement was at all definite and reliable, or in the nature of a warranty, would not one answer have sufficed? Also, he asked Coleman and Ray to get their books and estimate, to ascertain how much crude stuff went into the pile and how much had been taken out, but they would not help him. Why this anxiety to get at the quantity in other ways if he was relying on Coleman's statement? The plain inference seems to be that Coleman's statements were too indefinite and unsubstantial to be acted upon. Huger's letter of Nov. 28th, 1891, to Coleman and Ray, confirms this. This letter was written not three weeks after the negotiations, when his recollection of the transaction was fresh. It was the first letter repudiating liability for the excess of fertilizers; his language was probably guarded and his words weighed, because he had then been notified of the transfer of the contract to plaintiff and a lawsuit was in prospect. In this he writes: *As a matter of fact you* [*Coleman & Ray*] *would not help the writer in any way to estimate the number of tons, stating you knew nothing about it.* The conclusions to be drawn from this letter, and which seem inevitable, are, first, that Coleman and Ray did disclaim all knowledge as to the actual number of tons in the pile; second, that whatever representations were in fact made by them, they did not assist Huger in any way and were not relied upon by him in making up his mind; and third, having been denied help from them in forming his estimate, he was thrown back upon his own judgment, and that he did in fact rely and act solely

upon his own experience, judgment and responsibility. This letter, we think, exonerates Coleman and Ray from any responsibility for Huger's conduct. We think that, by the preponderance of the evidence, he appears to have been influenced by other considerations, by his own estimate, by the necessity for prompt action, by the desire to collect a debt and at the same time avoid complications, and in the absence of accurate knowledge of the quantity, having sought it from them and failed to get it, but believing it to be in the neighborhood of 253⅓ tons, he voluntarily took a bill of sale of the entire pile 'estimated to be 253⅓ tons, more or less,' as the best thing to be done under all the circumstances, instead of a bill of sale of the exact amount to settle his debt, as he could have done. We therefore find that the defendant's plea is not sustained.

"Our views, however, on the whole case, are controlled by the construction we have put upon the contract and the effect to be given to the words 'estimated to be 253⅓ tons, more or less,' and we think that the defendant in accepting and paying for 265⅕ tons under the contract has reasonably complied with it, and that more cannot be required of it.

"Wherefore it is considered, ordered and decreed by the court that judgment be rendered in favor of the defendant, with costs of suit. In open court, June 7th, 1893.          A. H. MacDonell, Judge C. C. S."

FLEMING & ALEXANDER and ERWIN, DUBIGNON & CHISHOLM, for plaintiff.

CHARLTON, MACKALL & ANDERSON, for defendant.

LUMPKIN, Justice.

This case, by consent, was tried by his honor, Judge MacDonell, without the intervention of a jury. He rendered a judgment in favor of the defendant, and this is the main error complained of in the bill of exceptions.

The opinion delivered by the trial judge is set forth in full by the reporter, and it contains all that is necessary to a clear understanding of the case.

We fully agree with the judge that the contract was plain and unambiguous, and shall deal with the case upon the assumption that all his findings upon issues of fact are correct.   There can, we think, be no question that this is the proper course for us to pursue.   His conclusion that the Commercial Guano Company in making, through its agents, the purchase from Coleman & Ray, did not act upon any representations made by the sellers, but that these agents relied entirely upon their own judgment as to the quantity of fertilizer in the pile, is clear and unequivocal, and undoubtedly well supported by the evidence.   Upon the question whether or not the sellers, or either of them, practiced any actual fraud in the representations made by them as to quantity, the conclusion of the judge is not distinctly stated; but it is certainly fair to say he does not find that any such fraud was practiced.   We are therefore authorized in saying that the existence of such fraud was not made to appear, and we think the case should be decided upon the theory that it was not proved at all.   Assuming this to be true, we are constrained to hold that the learned judge erred in the conclusion he reached.   We adopt as the true law of the case the doctrine laid down in Brawley v. United States, 96 U. S. 168, cited in the judge's opinion.   We do not think the doctrine of section 2642 of the code, in relation to the sale of land, nor the various decisions of this court construing this section, applicable to the facts of this case.   It must not be overlooked that the entire pile of fertilizer was bought, not at a fixed total sum, but for a stated price per ton, and enforcing the contract as made gives to the purchaser precisely what he bought, and at the price agreed upon.   An express provision was made in the

contract for any variation in the estimated quantity; hence, there can be no legal fraud simply because there was in fact an excess over the quantity it was supposed the pile contained. That the defendant company did not intend simply to take enough fertilizer to settle its debt is conclusively shown by the fact that they agreed to take more than 253⅓ tons, that being the exact quantity which would have cancelled their debt of $5,700.00 at the agreed price of $22.50 per ton. On the whole, we are satisfied that the plaintiff was entitled to a recovery, and that the judge below erred in holding otherwise.                              *Judgment reversed.*